591 S.E.2d 627

**In the Matter of Joseph Wendell ARSI, Respondent.**

**No. 25766.**

Supreme Court of South Carolina.

Submitted Dec. 9, 2003.

Decided Jan. 12, 2004.

Henry B. Richardson, Jr., of Columbia, for the Office of Disciplinary Counsel.

Desa Ballard, of West Columbia, for respondent.

PER CURIAM:

In this attorney disciplinary matter, respondent and the Office of Disciplinary Counsel have entered into an Agreement for Discipline by Consent pursuant to Rule 21, RLDE, Rule 413, SCACR. In the agreement, respondent admits misconduct and consents to the sanction of disbarment. We accept the agreement and disbar respondent from the practice of law in this state. The facts, as set forth in the agreement, are as follows.

## Facts

### I. *Trust Account Matter*

From September 2002 through July 2003, respondent, who had a large real estate practice, issued approximately 750 checks from his trust account to his operating account. The checks were not, on the occasions issued, payment for earned fees, but were from monies belonging to clients and/or lenders involved in pending real estate transactions. Respondent began this misappropriation in an effort to maintain his law practice after there was a dramatic reduction in the number of closings he was handling.

The checks at issue were usually written in amounts of $500, $550, or $600. Respondent wrote anywhere from ten to thirty-five checks at a time. The checks were written to appear like and replicate checks for fees respondent was regularly paid out of his trust account for real estate transactions. Respondent maintained a ledger of the checks which showed the check number, date of issuance and amount of money owed to the trust account due to the issuance of the checks. As real estate transactions were closed, respondent would use the check number of a previously written check listed on the ledger as the fee due respondent for that transaction so as to balance respondent's records for that particular transaction. Respondent would then delete that check number from the ledger.

As of February 2003, respondent had repaid all amounts previously misappropriated using the foregoing arrangement. Respondent repaid the misappropriated funds by not issuing checks for fees for real estate closings and instead using check

numbers of checks already on the ledger to balance the trust account records for a particular real estate transaction.

However, beginning in March 2003, respondent resumed issuing checks from his trust account to his operating account pursuant to the foregoing arrangement, but was unable to repay those amounts due to a further downturn in the number of real estate closings his firm was handling.

Respondent misappropriated approximately $412,000 under the foregoing arrangement. After deducting the amount repaid from the total amount misappropriated, there was, and presently remains, a shortage in respondent's trust account of approximately $327,000.

Respondent self-reported his misconduct to the Office of Disciplinary Counsel and consented to being placed on interim suspension. *In the Matter of Arsi,* 355 S.C. 411, 585 S.E.2d 778 (2003). Respondent has fully cooperated with the Office of Disciplinary Counsel as well as the attorney appointed to protect the interests of respondent's clients.

## II. *Refinancing Matter*

Respondent represented clients who refinanced a mortgage. The closing documents indicated the existing mortgage was to be paid from the proceeds of the refinancing transaction. The new mortgage was recorded and forwarded to the new lender along with a final loan policy of title insurance. A condition for the issuance of the loan policy of title insurance was that the existing mortgage be paid off and satisfied of record. The loan policy indicated the new mortgage was a first mortgage on the public records when, in fact, the existing mortgage had not been satisfied. Several months after the closing, respondent's clients were contacted by the holder of the existing mortgage and discovered the existing mortgage had not been paid. The clients attempted to contact respondent but for several months were only able to talk to respondent's staff. After the clients were finally able to talk directly with respondent, respondent caused the existing mortgage to be paid off and satisfied of record.

Respondent maintains the check to pay off the existing mortgage was issued at closing and was hand delivered to the holder of the mortgage on the day of closing, the original

check has never been located, and respondent has not been able to discover any explanation as to what happened to the check after it reached the holder of the existing mortgage. Respondent contends the funds to pay the existing mortgage remained secure in respondent's trust account from the time they were received until paid by way of a new check to the holder of the existing mortgage.

Respondent acknowledges he did not provide competent representation to the clients, that he was not diligent in handling the matter, and that he gave incorrect information to the new lender when he represented that the new mortgage constituted a first lien of record on the secured property when, in fact the existing mortgage constituted a first lien on the property.

Respondent maintains he was utilizing a computer program that he thought was reconciling his trust account on a monthly basis. However, respondent recognizes that the system he was using was inadequate to meet the requirements of Rule 417, SCACR, inasmuch as respondent failed to recognize the funds in this matter had been retained and undisbursed in his trust account for over a one-year period. Approximately fourteen months elapsed from the date of the closing of the refinanced transaction until the existing mortgage was paid off and satisfied of record. As a result of the foregoing, foreclosure proceedings were initiated against the clients by the holder of the existing mortgage, but were eventually resolved. In addition, the clients filed a civil action against respondent which was settled.

## III. *Title Insurance Matter*

Respondent, directly and/or through a title insurance agency, was a title insurance agent for, and obtained title insurance from, a title insurance company from 1999 through December 2001. Respondent was the owner of or had a substantial interest in the title insurance agency. On numerous occasions there was an undue delay in the issuance of final title insurance policies after the related loan transaction had been closed, which resulted in the title insurance company terminating its agency relationship with respondent and the title insurance agency. Thereafter, the title insurance company

spent over a year preparing final title insurance policies on transactions closed by respondent while an agent for the company. Respondent acknowledges that on numerous occasions related to loan closings involving title insurance from the title insurance company, respondent did not provide competent representation, was not diligent, and did not properly supervise his non-lawyer staff.

The title insurance company maintains it is owed, by respondent and/or the title insurance agency, $4,353.23 for title insurance premiums collected by respondent and/or the title insurance agency but not forwarded to the title insurance company. Respondent contends the failure to pay the amount due was not a result of misappropriation of funds by respondent, but was instead due to respondent's failure to supervise his non-lawyer staff and his failure to comply with Rule 417, SCACR. However, respondent does not believe he owes any money to the title insurance company and maintains he has never received a statement or claim from the company for the amount it claims it is due. Regardless, respondent acknowledges he did not provide competent representation in connection with the related real estate transactions, was not diligent in the completion of work undertaken in connection with the transactions, and did not properly see to the safekeeping of funds belonging to the company that were deducted from proceeds of the real estate transactions.

## IV. *Title Agency Matter*

Respondent entered into a business arrangement with a non-lawyer to form the above-referenced title insurance agency in which both respondent and the non-lawyer were principles. The agency entered into a title insurance underwriting agreement with a title insurance company. Under the terms of the agreement, respondent was required to maintain a separate escrow account for all funds received in connection with the title insurance company's title insurance policies and to remit premiums collected, and copies of all policies and commitments issued, to the company on a monthly basis. Respondent, acting as closing attorney, and the agency began closing real estate loans. Thereafter, differences arose between respondent and the non-lawyer, the agency ceased operations and the business arrangement between respondent

and the non-lawyer was dissolved. Because it appeared that all title insurance premiums due the title insurance company had not been paid by the agency, and that there was a shortage in excess of $66,000, the title insurance company initiated a civil action against respondent. That action is still pending.

Respondent maintains he did not withhold any of the funds due the title insurance company,[1] but acknowledges he failed to properly supervise the non-lawyer employee of the agency and failed to oversee the safekeeping of the title insurance premiums collected by the agency in real estate closings handled by respondent in contravention of the procedures established by this Court for the operation of trust accounts and the handling of monies of others and in violation of the agreement between respondent and the title insurance company. Respondent contends any shortage in funds owed to the company is not due to any acts committed on the part of respondent or to misappropriation of funds.

## V.   *Carolina Title Services Matter*

Respondent closed approximately five real estate transactions in a two-week period for Carolina Title Services (CTS). There were no licensed attorneys employed by CTS. Pursuant to an arrangement between respondent and CTS, CTS prepared the closing documents and respondent reviewed the title abstract and closing documents and attended the closings as attorney for the borrowers. The HUD-1 Settlement Statements showed respondent as the "settlement agent" and respondent signed the settlement statements in that capacity. However, respondent represents his signature was added without his knowledge by non-lawyer staff of CTS.

For a period of time, respondent left disbursement of the proceeds from the transactions to be completed by the non-lawyer staff of CTS. During this period, respondent was under the impression, from discussions with the manager of CTS, that another attorney, William J. McMillian, III, was oversee-

---

1.   Respondent also believes the shortage to be considerably less than that claimed by the title insurance company due to the fact that the company's audit was based on commitments instead of policies actually issued.

ing the disbursement of the proceeds of the transactions, the recordation of documents, and any other aspects of the closings required to be performed by an attorney. Respondent relied on those representations from the manager, but did not discuss the arrangement with McMillian. McMillian did, in fact, have a close working relationship concerning the closing of real estate transactions with CTS and respondent was aware of that relationship. Respondent was paid by way of checks drafted on McMillian's trust account, signed by the manager of CTS, and transmitted to respondent by CTS rather than McMillian. All of the checks were returned due to insufficient funds; therefore, respondent was not paid for his services in the transactions.

Respondent later learned that McMillian was not involved in the transactions, that the manager of CTS had signature authority on McMillian's trust account, and that disbursements were being made by CTS without supervision by a licensed attorney. Thereafter, respondent insisted that all disbursements on real estate transactions with CTS be made by respondent through respondent's trust account. Respondent is now aware that the manager of CTS had directed the bank to "sweep" all funds out of McMillian's IOLTA trust account each day into the manager's personal bank account, which later resulted in a considerable shortage of funds in McMillian's trust account; however, respondent was unaware of that arrangement during the time respondent allowed CTS to handle the disbursement of funds from real estate transactions. Respondent now recognizes that, as a result of his reliance on incorrect information from the manager of CTS, respondent assisted one or more of the non-lawyer employees of CTS to engage in the unauthorized practice of law. Respondent maintains he discontinued participating in the "closing only" arrangement with CTS when he learned that representations made to him regarding the involvement of McMillian in other aspects of the transactions were incorrect.

In one case, respondent reviewed the closing documents but was unable to attend the closing due to a scheduling conflict. Respondent retained attorney Stephen M. Pstrak to attend the closing in his place. However, respondent did not advise the clients of the limited scope of Pstrak's representation. Neither respondent nor Pstrak did any further work on the

matter after the closing. Shortly thereafter, McMillian was placed on interim suspension by this Court and his trust account, used by CTS for disbursement of funds from the transaction, was frozen by the attorney appointed to protect the interests of McMillian's clients. *In the Matter of McMillian,* 350 S.C. 216, 565 S.E.2d 765 (2002). Some time later, respondent was advised that the transaction had not been completed. The clients had to retain another attorney to complete the closing, which took approximately one year. Respondent was never paid for the closing, but paid Pstrak for his participation.

Respondent contends he was under the mistaken impression on the occasion of the closing that McMillian would be handling the disbursement of the funds and recordation of the closing documents when, in fact, he now knows McMillian was not involved in the transaction and it was, instead, being handled by non-lawyer employees of CTS without the supervision of a licensed attorney. Respondent now recognizes that it was his responsibility to see that the transaction was properly closed and that the proceeds from the transaction were disbursed in accordance with the settlement statement since Pstrak, as his designee, signed as "settlement agent" under respondent's authorization and direction, and that it was his further responsibility to have assisted the clients in removing the impediments to closing once respondent was advised that the transaction had not been completed. However, due to respondent not supervising the non-lawyer employees of CTS after closing, respondent was unaware that the transaction had not been completed until some time later by the new attorney for the clients.

## VI.  *Cooperation With Disciplinary Counsel*

Disciplinary Counsel states that, to the best of his knowledge and belief, respondent has fully cooperated with the inquiries of Disciplinary Counsel into the above-referenced matters and that respondent has been forthright in acknowledging the misconduct set forth herein. Disciplinary Counsel states further that respondent maintained he did not realize some of his actions constituted misconduct at the time, but now recognizes as much with the advice of counsel and the advantage of hindsight.

16

## *Law*

Respondent admits that by his conduct he has violated the following provisions of the Rules of Professional Conduct, Rule 407, SCACR: Rule 1.1 (a lawyer shall provide competent representation to a client); Rule 1.2(a) (a lawyer shall abide by a client's decisions concerning the objectives of representation, except in limited circumstances, and shall consult with the client as to the means by which they are to be pursued); Rule 1.2(c) (a lawyer may limit the objectives of the representation if the client consents after consultation); Rule 1.3 (a lawyer shall act with reasonable diligence and promptness in representing a client); Rule 1.4(a) (a lawyer shall keep a client reasonably informed about the status of a matter and promptly comply with reasonable requests for information); Rule 1.15(a) (a lawyer shall hold property of clients that is in the lawyer's possession in connection with a representation separate from the lawyer's own property); Rule 1.15(b) (a lawyer shall promptly deliver to the client any funds that the client is entitled to receive); Rule 5.3(b) (a lawyer having direct supervisory authority over a nonlawyer shall make reasonable efforts to ensure that the person's conduct is compatible with the professional obligations of the lawyer); Rule 5.3(c) (a lawyer shall be responsible for conduct of a nonlawyer that would be a violation of the Rules of Professional Conduct if engaged in by a lawyer if the lawyer orders or, with the knowledge of the specific conduct, ratifies the conduct involved or the lawyer is a partner in the law firm in which the person is employed, or has direct supervisory authority over the person, and knows of the conduct at a time when its consequences can be avoided or mitigated but fails to take reasonable remedial action); Rule 5.4(c) (a lawyer shall not permit a person who recommends, employs, or pays the lawyer to render legal services for another to direct or regulate the lawyer's professional judgment in rendering such legal services); Rule 5.4(d) (a lawyer shall not practice with or in the form of a professional corporation or association authorized to practice law for a profit, if a nonlawyer owns any interest therein, except that a fiduciary representative of the estate of a lawyer may hold the stock or interest of the lawyer for a reasonable time during administration, a nonlawyer is a corporate director or officer thereof or a nonlawyer has the right to

direct or control the professional judgment of a lawyer); Rule 5.5(b) (a lawyer shall not assist a person who is not a member of the bar in the performance of activity that constitutes the unauthorized practice of law); Rule 8.4(a) (it is professional misconduct for a lawyer to violate the Rules of Professional Conduct); Rule 8.4(b) (it is professional misconduct for a lawyer to commit a criminal act that reflects adversely on the lawyer's honesty, trustworthiness or fitness as a lawyer in other respects); Rule 8.4(c) (it is professional misconduct for a lawyer to engage in conduct involving moral turpitude); Rule 8.4(d) (it is professional misconduct for a lawyer to engage in conduct involving dishonesty, fraud, deceit or misrepresentation); and Rule 8.4(e) (it is professional misconduct for a lawyer to engage in conduct that is prejudicial to the administration of justice).

Respondent also acknowledges that his misconduct constitutes grounds for discipline under the following provisions of Rule 7, RLDE, Rule 413, SCACR: Rule 7(a)(1) (it shall be a ground for discipline for a lawyer to violate the Rules of Professional Conduct); Rule 7(a)(5) (it shall be a ground for discipline for a lawyer to engage in conduct tending to pollute the administration of justice or to bring the courts or the legal profession into disrepute); and Rule 7(a)(7) (it shall be a ground for discipline for a lawyer to violate a valid court order issued by a court of this state).

Finally, respondent admits that he failed to comply with the record keeping and money handling procedures set forth in Rule 417, SCACR.

## Conclusion

We accept the Agreement for Discipline by Consent and disbar respondent. Respondent's request that the disbarment be made retroactive to the date he was placed on interim suspension is denied.

Within thirty days of the date of this opinion, Disciplinary Counsel and respondent shall establish a restitution plan pursuant to which respondent shall pay restitution to all persons and entities who have incurred losses as a result of respondent's misconduct in connection with this matter. Respondent shall also reimburse the Lawyers' Fund for Client

Protection for any claims paid as a result of his misconduct in connection with this matter. Failure to make restitution in accordance with this opinion and the restitution plan may result in respondent being held in contempt of this Court. Moreover, respondent shall not apply for readmission unless and until all such restitution has been paid in full.

Within fifteen days of the date of this opinion, respondent shall file an affidavit with the Clerk of Court showing that he has complied with Rule 30 of Rule 413, SCACR, and shall also surrender his Certificate of Admission to the Practice of Law to the Clerk of Court.

DISBARRED.

TOAL, C.J., MOORE, WALLER, BURNETT and PLEICONES, JJ., concur.